******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* STEPHANIE U.*
(AC 41793)

Bright, C. J., and Prescott and Elgo, Js.

*Syllabus*

Convicted of various crimes in connection with her actions while attempting to pick up her child from day care while allegedly under the influence of intoxicating liquor or drugs, the defendant appealed to this court. The defendant testified on her own behalf at trial. During cross-examination, the prosecutor asked the defendant whether she had an interest in the outcome of the trial and implied that the defendant had the opportunity to tailor her testimony by taking the stand after observing the testimony of all of the other witnesses. Additionally, during the rebuttal portion of her closing argument, the prosecutor argued that the defendant was the only witness who had the opportunity to hear the testimony of the other witnesses prior to giving her own testimony, that she had a vested interest in the outcome of the case, and that the jurors could consider that interest in their decision-making process. On appeal, the defendant claimed, inter alia, that the prosecutor's questioning and argument constituted generic tailoring, which violated her right to confrontation and her right to testify on her own behalf under both the state and federal constitutions. *Held*:

1. The defendant failed to prove her unpreserved claim that the prosecutor violated her state constitutional rights to confront witnesses against her and to testify on her own behalf: although the state's tailoring questions and argument were generic because they were not tied to evidence that specifically gave rise to an inference of tailoring and instead focused on the defendant's presence in the courtroom, her ability to observe the proceedings, and her interest in the outcome of the trial, the defendant failed to prove that the state constitution offered greater protection than the federal constitution and, accordingly, failed to establish a constitutional violation under *State* v. *Geisler* (222 Conn. 672), as the language of article first, § 8, of the Connecticut constitution was virtually identical to that of the sixth amendment to the federal constitution, Connecticut's early recognition of a defendant's right to testify provided no insight as to whether the state historically viewed generic tailoring as improper, most of the cases that the defendant claimed were persuasive precedent from other states relied on the supervisory authority of the courts and on public policy to prohibit generic tailoring arguments or questions rather than on their state constitutions, the United States Supreme Court in *Portuondo* v. *Agard* (529 U.S. 61) held that generic tailoring arguments did not violate the federal constitution, Connecticut precedent after *Portuondo* did not demonstrate that the state courts considered generic tailoring arguments to raise state constitutional issues, and the defendant's argument that public policy considerations required a conclusion that generic tailoring arguments violated the state constitution was not compelling.

2. The prosecutor did not deny the defendant her due process of law under either the federal or state constitutions: the defendant's claim was unpreserved and it failed under the third prong of *State* v. *Golding* (213 Conn. 233); moreover, our Supreme Court in *State* v. *Medrano* (308 Conn. 604) held that a trial court's instruction that a jury could consider the defendant's interest in the outcome of the case did not implicate the defendant's right to due process, and the defendant in this case failed to demonstrate that a prosecutor's similar argument could have more of an impact on her due process rights than a court's jury instruction.

3. The prosecutor did not deprive the defendant of a fair trial when she argued that the defendant had tailored her testimony and that she had a motive to lie: the defendant failed to establish a claim of prosecutorial impropriety because she failed to prove that the prosecutor's argument and questions infringed on her constitutional rights.

4. This court declined to employ its supervisory authority over the administration of justice to expand the Supreme Court's decision in *State* v. *Medrano* (308 Conn. 604) to prohibit a prosecutor from making argu-

ments about the defendant's interest in the outcome of his or her criminal trial, the defendant having failed to persuade this court that such argument merits the exercise of that authority.

5. Although the defendant was not entitled to a new trial because the prosecutor's generic tailoring questions and comments did not affect the fairness of her trial, this court exercised its supervisory authority over the administration of justice to prohibit prosecutors from employing generic tailoring arguments in future criminal cases: this court determined that generic tailoring arguments should be prohibited because they were likely to implicate the perceived fairness of the judicial system and could give rise to a danger of juror misunderstanding; accordingly, this court held that, prior to asking tailoring questions or before making such comments in closing arguments in the future, a prosecutor must inform the trial court and the defendant of her intention to do so and, if the defendant objects, the trial court must determine that the prosecutor's questions or argument are specific before allowing the state to proceed.

6. The defendant could not prevail on her claim that her conviction of attempt to commit risk of injury to a child should be vacated because the crime was cognizable: our Supreme Court determined in *State* v. *Sorabella* (277 Conn. 155) that attempt to commit risk of injury to a child was a cognizable offense and this court was bound by that decision.

Argued January 5—officially released August 24, 2021

*Procedural History*

Substitute information charging the defendant with the crimes of operating a motor vehicle while under the influence of intoxicating liquor or drugs, operating a motor vehicle while her license was under suspension and attempt to commit risk of injury to a child, brought to the Superior Court in the judicial district of Tolland, geographical area number nineteen, and tried to the jury before *Seeley, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Laila M. G. Haswell*, senior assistant public defender, for the appellant (defendant).

*James M. Ralls*, assistant state's attorney, with whom were *Matthew C. Gedansky*, state's attorney, and *Jaclyn Dulude*, assistant state's attorney, for the appellee (state).

*Opinion*

BRIGHT, C. J. The defendant, Stephanie U., appeals from the judgment of conviction of operating a motor vehicle while under the influence of intoxicating liquor or drugs in violation of General Statutes § 14-227a (a) (1), operating a motor vehicle while her operator's license was under suspension in violation of General Statutes § 14-215 (a), and attempt to commit risk of injury to a child in violation of General Statutes §§ 53-21 (a) (1) and 53a-49 (a) (2). On appeal, the defendant claims that (1) the prosecutor violated her state constitutional rights to confront witnesses against her and to testify on her own behalf by improperly attacking her credibility during cross-examination and in her closing rebuttal argument by suggesting that she had tailored her testimony to conform to the evidence she had overheard during her trial, (2) the prosecutor denied her due process of law under both the federal and state constitutions when, during cross-examination, the prosecutor asked the defendant whether she had an interest in the outcome of the trial, and when, during rebuttal argument, the prosecutor told the jury that it could consider the defendant's vested interest in the outcome of the trial, (3) prosecutorial impropriety deprived her of a fair trial when the prosecutor argued that she had tailored her testimony and that she had a motive to lie, (4) this court, in the alternative, should order a new trial after we employ our supervisory authority to prohibit questions and arguments that amount to generic tailoring and/or telling or implying to the jury that it can or should discredit the defendant's trial testimony because she has an "interest in the outcome" of her trial, and (5) her conviction of attempt to commit risk of injury to a child should be vacated because it is not a cognizable crime. We reject the defendant's claims, although we agree with her request to exercise our supervisory authority over the administration of justice on the issue of generic tailoring. Nevertheless, because we conclude that the prospective rules we articulate regarding generic tailoring would not have changed the outcome of the defendant's trial, we affirm the judgment of the trial court.

The following facts, as reasonably could have been found by the jury on the basis of the evidence presented at trial, and the relevant procedural history, inform our review of the defendant's claims. On October 30, 2015, at approximately 5 p.m., the defendant arrived to pick up her one year old child at a Vernon day care center. Jessica Woodruff also was there to pick up her own child, and she witnessed the defendant stumbling out of a vehicle, having difficulty walking into the day care, repeatedly stumbling, having difficulty "hold[ing] herself up," and falling backward. Woodruff believed that the defendant was intoxicated. Once inside, several people, including Woodruff; the assistant director of the

day care, Kathleen Wheeler; and a teacher at the day care, Elyse DeGemmis, observed the defendant slur, mumble, and grab onto various objects in an effort to support herself. Wheeler and DeGemmis were so concerned that they called 911.

Detective John Divenere of the Vernon Police Department was dispatched to the day care on a report of an intoxicated woman attempting to pick up her child. On his arrival, someone pointed out the defendant. When Divenere asked the defendant for identification, she handed him her state identification card and, when asked about her driver's license, she told him that it had been suspended. Divenere observed that the defendant's eyes were glassy, her speech was slow and slurred, and she was having difficulty maintaining her balance. The defendant denied to Divenere that she had taken drugs or alcohol, or that she had medical issues, disabilities, or diabetes. Divenere administered two "preliminary" tests that are not part of the field sobriety tests, namely, the "alphabet" test and the "counting backwards" test. At his request, the defendant performed each test several times. The defendant slurred her speech and skipped letters and numbers during each of the tests. The defendant appeared intoxicated to Divenere, who then administered several field sobriety tests, all of which the defendant failed. Officer David Provencher, who also had arrived at the day care, recorded on his body camera the defendant performing the field sobriety tests. Divenere arrested the defendant and took her to the police station.[1]

At approximately 6 p.m., while at the police station, Divenere advised the defendant of her rights. The defendant again denied that she had any medical issues or that she had consumed alcohol. She did state that she was prescribed Xanax but that she had not taken it that day. Divenere observed that the defendant did not smell of alcohol or marijuana, her eyes were not bloodshot or red, and her pupils were not dilated or constricted. Divenere did not find any drugs, drug paraphernalia, or alcohol in the defendant's vehicle or purse. Divenere administered a Breathalyzer test, which resulted in a reading of zero. He then asked the defendant to take a urine test, which the defendant initially agreed to take but then declined.[2]

On the basis of this evidence, the jury found the defendant guilty of illegal operation of a motor vehicle while under the influence of intoxicating alcohol or drugs, illegal operation of a motor vehicle while her license was under suspension, and attempt to commit risk of injury to a child. The court accepted the jury's verdict and sentenced the defendant to a total effective term of five years of imprisonment, execution suspended after eighteen months, followed by five years of probation. This appeal followed. Additional facts will be set forth as necessary.

# I

The defendant claims that the prosecutor violated her state constitutional rights, under article first, § 8, to confront witnesses against her and to testify on her own behalf by improperly attacking her credibility when engaging in a generic tailoring argument, by suggesting during cross-examination and during closing rebuttal argument that she had tailored her testimony to conform to the evidence that she heard during her criminal trial. The defendant did not preserve her claim and asks for review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–240, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015).[3] We conclude that the defendant's claim is reviewable but that it fails under the third prong of *Golding*. In particular, we conclude that the defendant has failed to prove that the state constitution offers greater protection than the federal constitution with respect to confrontation rights, and, therefore, she cannot establish that a state constitutional violation exists.

The following additional facts are necessary to our consideration of the defendant's claim. During trial, the defendant testified on her own behalf. She explained to the jury that she had experienced mental health issues, including mood disorders, anxiety, and bipolar disorder, since she was a child, and that she takes Xanax as needed. She also testified that the day before this incident, she had gotten into a verbal altercation with a coworker and quit her job. The defendant further explained that, on the day of the incident, she met with her manager and someone from human resources to ask for her job back, but she was not successful. She testified that, later in the day, when it was time to pick up her child from day care, her grandmother, who had been providing transportation, was unavailable; so, despite knowing that her license was under suspension, she drove to the day care to pick up her child. She denied that she had been disorientated when she went to the day care, but she testified that the body camera video convinced her that she had undergone a mental health episode while at the day care center. She explained that the video showed her experiencing tics and pulling her hair, which signaled a mental health episode.

During cross-examination, the prosecutor asked the defendant:

"Q. And you've had an opportunity to sit in court and listen to all of the witnesses testify in this case; correct?

"A. Yes.

"Q. So you've been able to listen to their testimony and figure out what you're going to say today; correct?

"A. What I'm going to say today?

"Q. Yeah; during your testimony.

"A. No.

"Q. You haven't listened to their testimony?

"A. Yes. I've listened to what they've had to say.

"Q. Okay. And you have a lot riding on this case, don't you?

"A. Today?

"Q. Sure.

"A. Well, yeah. I have my son, my apartment. I have a life. My son is everything to me."

The next day, during the rebuttal portion of her closing argument, the prosecutor argued in relevant part: "Also consider the fact that the only witness to have sat in on the testimony of all the other witnesses in this case is the defendant. None of the other witnesses got to hear the others' testimony. The defendant knew what everyone said and had that knowledge when she testified. She has a vested interest in the outcome of this case. And that can also be taken into account when you're deliberating this case.

b"Does it make sense, with regard to the day care workers,
that three independent individuals who have no interest in this case would tell you similar stories and describe similar behaviors of the defendant; that this would be untruthful or lying testimony, as indicated by defense counsel?

"The defendant testified that she did not act in any way as described by the day care workers. Totally unequivocal; I did not act that way at all. These are individuals out in the community, going about their day-to-day lives, going to work, picking up children. Think about how those witnesses testified, as opposed to the defendant."

On appeal, the defendant argues that, "[d]uring cross-examination, the state asked the defendant point blank whether she had listened to all of the witnesses who had testified beforehand and 'figured out' what she was going to say. Furthermore, in its rebuttal, the state argued that the defendant was the only witness who heard all of the other testimony, and she tailored her evidence accordingly. These generic tailoring arguments violated the defendant's right of confrontation and right to testify because they turned the defendant's unassailable rights to be present during all the testimony and to testify on her own behalf into a weapon used against her. This court must hold, under the Connecticut constitution article [first], § 8 . . . that the state may not raise generic tailoring claims at any point in the trial."

A

We first consider whether the questions and remarks

of the prosecutor amounted to generic tailoring.

"A prosecutor makes a tailoring argument when he or she attacks the credibility of a testifying defendant by asking the jury to infer that the defendant has fabricated his testimony to conform to the testimony of previous witnesses. See *Portuondo* v. *Agard*, 529 U.S. 61, 73, 120 S. Ct. 1119, 146 L. Ed. 2d 47 (2000). The term most frequently is used to refer to a prosecutor's direct comment during closing argument on the defendant's opportunity to tailor his testimony, although a prosecutor sometimes also will use cross-examination to convey a discrediting tailoring message to the jury. There are two types of tailoring arguments: generic and specific. The former occurs when the prosecutor argues the inference solely on the basis of the defendant's presence at trial and his accompanying opportunity to fabricate or tailor his testimony. *State* v. *Alexander*, 254 Conn. 290, 300, 755 A.2d 868 (2000); see also *State* v. *Daniels*, 182 N.J. 80, 98, 861 A.2d 808 (2004) ([g]eneric accusations occur when the prosecutor, despite no specific evidentiary basis that [the] defendant has tailored his testimony, nonetheless attacks the defendant's credibility by drawing the jury's attention to the defendant's presence during trial and his concomitant opportunity to tailor his testimony). A specific tailoring argument, by contrast, occurs when a prosecutor makes express reference to the evidence, from which the jury might reasonably infer that the substance of the defendant's testimony was fabricated to conform to the state's case as presented at trial. See *State* v. *Daniels*, supra, 98 ([a]llegations of tailoring are specific when there is evidence in the record, which the prosecutor can identify, that supports an inference of tailoring)." (Footnote omitted; internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 543–44, 212 A.3d 208 (2019).

In *Weatherspoon*, our Supreme Court concluded that the prosecutor's tailoring argument was specific because it "contained two different but related evidence-based assertions: first, the discrepancy between the defendant's pretrial statement to [the police] and his in-court trial testimony supports the inference that his in-court testimony is false; and second, the defendant's false testimony about his memory allowed him to conform his recitation of events to that of [another witness'] trial testimony, thereby supporting a reasonable inference of tailoring." Id., 549–50. By contrast, "[g]eneric tailoring arguments occur when the prosecution attacks the defendant's credibility by simply drawing the jury's attention to the defendant's presence at trial and his resultant opportunity to tailor his testimony." (Internal quotation marks omitted.) *State* v. *Papantoniou*, 185 Conn. App. 93, 99 n.11, 196 A.3d 839, cert. denied, 330 Conn. 948, 196 A.3d 326 (2018).

Our Supreme Court in *Weatherspoon* was asked to

decide whether generic tailoring arguments, which do not violate the federal constitution; see *Portuondo* v. *Agard*, supra, 529 U.S. 70–73; violate a defendant's right to confrontation under article first, § 8, of the Connecticut constitution. *State* v. *Weatherspoon*, supra, 332 Conn. 543. The court did not reach the question because it concluded that the tailoring argument made by the prosecutor in that case was a specific tailoring argument and the defendant had not claimed on appeal that specific tailoring arguments violate the state constitution. Id., 549–50.

In the present case, the defendant argues that the prosecutor's questions during cross-examination of the defendant and her remarks during her rebuttal closing argument were generic tailoring, and she asks that we address the state constitutional question not reached by our Supreme Court in *Weatherspoon*. The state argues that we should not reach the constitutional question because, as in *Weatherspoon*, the state's tailoring argument in the present case was specific and not generic. We agree with the defendant that the state's tailoring argument was generic.

During cross-examination, the prosecutor asked the defendant about her ability to listen to all of the arguments and figure out what she was going to say before she testified. Such questioning focused the jury's attention, not on any specific evidence that the defendant tailored her testimony but, instead, on the defendant's mere presence in the courtroom, her opportunity to observe the proceedings, her ability to tailor her testimony on the basis of her presence in the courtroom and her observations, and the fact that she had a vested interested in the outcome of her criminal trial.

Then, during the rebuttal portion of her closing argument, the prosecutor similarly called to the jury's attention the fact that the defendant was the only testifying witness to have heard all of the trial testimony, and that she knew the substance of each witness' testimony before she, herself, testified. The prosecutor then again tied that argument to the fact that the defendant had a vested interest in the proceedings.

The state argues that the defendant is viewing the tailoring questions and remarks of the prosecutor out of context. According to the state, the tailoring comments were anchored sufficiently to evidence presented at trial to make them specific and not generic. With respect to the tailoring questions asked during cross-examination, the state argues that those questions followed the prosecutor's questions about the defendant's mental health, to which the defendant attributed her behavior on the day of her arrest. The state argues that the prosecutor's questions were intended to show that "the defendant tailored her testimony to the state's evidence of intoxication when she claimed, for the first time at trial, that her long-standing psychiatric problems mimicked

drug induced intoxication.'' With respect to the comments made during the prosecutor's rebuttal closing argument, the state argues that, immediately following the prosecutor's ''generic remarks,'' she compared the defendant's testimony to the consistency of the evidence from the day care workers, the police and the video recordings of the defendant's behavior. We are not persuaded that the record supports either of the state's arguments.

First, the prosecutor's questions that preceded her generic tailoring questions were unrelated to the defendant's testimony that her psychiatric problems caused her behavior that led to her arrest. Instead, the prosecutor's questions focused on the defendant's performance of the field sobriety tests, whether the defendant refused to provide a urine sample because she knew that it would show the presence of Xanax in her system, her long history of taking Xanax, and whether she took it on the day she was arrested to cope with the stressful situation at work. The fact that the defendant was present in court and heard the testimony of others was wholly unrelated to the inferences the state was asking the jury to draw from the defendant's answers to these questions. Because there is no connection between the tailoring questions asked by the state and the questions that preceded them, the tailoring questions were generic and not specific.

Second, the prosecutor's tailoring comments during her rebuttal closing argument were similarly generic because the argument that followed, on which the state relies, was not based on evidence that had any correlation to the defendant's presence in court. In particular, the prosecutor argued that the testimony of other witnesses regarding the defendant's behavior was more believable than the defendant's because the testimony of those witnesses was consistent with each other and those witnesses had no motivation to lie. In making this argument, the prosecutor made specific reference to the defendant's testimony that she did not act as those witnesses described. Thus, unlike in *Weatherspoon*, the prosecutor in the present case did not argue that defendant tailored her testimony to be consistent with the testimony of the state's witnesses. To the contrary, she argued that the defendant's testimony was flatly contrary to the testimony of more believable witnesses. Because the prosecutor's tailoring comments were not tied to specific evidence that gave rise to an inference of tailoring, the tailoring comments were generic, not specific.

### B

Having concluded that the prosecutor's tailoring arguments were generic and not specific, we consider the question not reached in *Weatherspoon*—whether the prosecutor's generic tailoring questions and argument violated the defendant's state constitutional rights

to confront witnesses and to testify on her own behalf in violation of article first, § 8.[4] The defendant argues that under the factors set forth in *State* v. *Geisler*, 222 Conn. 672, 684–85, 610 A.2d 1225 (1992), she has established a state constitutional violation. We are not persuaded.

"In . . . *Geisler* . . . we identified six nonexclusive tools of analysis to be considered, to the extent applicable, whenever we are called on as a matter of first impression to define the scope and parameters of the state constitution: (1) persuasive relevant federal precedents; (2) historical insights into the intent of our constitutional forebears; (3) the operative constitutional text; (4) related Connecticut precedents; (5) persuasive precedents of other states; and (6) contemporary understandings of applicable economic and sociological norms, or, as otherwise described, relevant public policies. . . . These factors, [commonly referred to as the *Geisler* factors and] which we consider in turn, inform our application of the established state constitutional standards . . . to the defendant's claims in the present case." (Citation omitted; internal quotation marks omitted.) *State* v. *McCleese*, 333 Conn. 378, 387–88, 215 A.3d 1154 (2019). Because "[i]t is not critical to a proper *Geisler* analysis that we discuss the various factors in any particular order or even that we address each factor"; id., 388; we review the *Geisler* factors in the order briefed by the defendant.

1

The first *Geisler* factor the defendant discusses is the operative constitutional text. See id., 387. Article first, § 8, of the Connecticut constitution provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . [and] to be confronted by the witnesses against him . . . . No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ." The defendant concedes that this *Geisler* factor favors the state. We agree.

As the defendant acknowledges, the language of article first, § 8, regarding the right to confrontation is virtually identical to that in the sixth amendment to the federal constitution. Compare U.S. Const., amend. VI ("[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him"), with article first, § 8, of the Connecticut constitution ("[i]n all criminal prosecutions, the accused shall have a right . . . to be confronted by the witnesses against him"). Because the United States Supreme Court has concluded that generic tailoring arguments do not violate federal constitutional rights; *State* v. *Weatherspoon*, supra, 332 Conn. 545–46; we agree with the defendant that this factor favors the state.

The next *Geisler* factor that the defendant discusses is the historical insights into the intent of our constitutional forebears. See *State* v. *McCleese*, supra, 333 Conn. 387. She concedes that the right to confrontation in the sixth amendment to the United States constitution and in article first, § 8, are nearly identical. She argues, however, that Connecticut has a long history of concern regarding a defendant's rights under article first, § 8; see *State* v. *Cassidy*, 236 Conn. 112, 122–24, 672 A.2d 899, cert. denied, 519 U.S. 910, 117 S. Ct. 273, 136 L. Ed. 2d 196 (1996), overruled in part by *State* v. *Alexander*, 254 Conn. 290, 295–96, 755 A.2d 868 (2000); and that this court should conclude that generic tailoring arguments impermissibly burden a defendant's right to testify. She contends that this *Geisler* factor favors the defendant. We conclude that this factor favors the state.

The defendant cites to historical facts in Connecticut that demonstrate the importance of the right to testify on one's own behalf throughout our history. We readily acknowledge the historical and continued importance of such a right. Nevertheless, Connecticut's early recognition of a defendant's right to testify provides no insight into whether generic tailoring was historically viewed as improper. In fact, the United States Supreme Court rejected a similar argument in *Portuondo* v. *Agard*, supra, 529 U.S. 65–66.

In *Portuondo*, the defendant argued that the prosecutor's generic tailoring argument violated his right to due process in the same way that a prosecutor violates a defendant's due process rights by commenting on a defendant's refusal to testify. Id., 64–65. In rejecting the defendant's argument, the court stated: "As an initial matter, [the defendant's] claims have no historical foundation, neither in 1791, when the Bill of Rights was adopted, nor in 1868 when, according to our jurisprudence, the [f]ourteenth [a]mendment extended the strictures of the [f]ifth and [s]ixth [a]mendments to the [s]tates. The process by which criminal defendants were brought to justice in 1791 largely obviated the need for comments of the type the prosecutor made here. Defendants routinely were asked (and agreed) to provide a pretrial statement to a justice of the peace detailing the events in dispute. See Moglen, The Privilege in British North America: The Colonial Period to the Fifth Amendment, in The Privilege Against Self-Incrimination 109, 112, 114 (R. Helmholz et al. eds. 1997). If their story at trial—where they typically spoke and conducted their defense personally, without counsel, see J. Goebel & T. Naughton, Law Enforcement in Colonial New York: A Study in Criminal Procedure (1664–1776), p. 574 (1944); A. Scott, Criminal Law in Colonial Virginia 79 (1930)—differed from their pretrial statement, the contradiction could be noted. See [L.] Levy, Origins of the Fifth Amendment and Its Critics,

19 Cardozo L. Rev. 821, 843 (1997). Moreover, what they said at trial was not considered to be evidence, since they were disqualified from testifying under oath. See 2 J. Wigmore, Evidence § 579 (3d. [E]d. 1940).

"The pretrial statement did not begin to fall into disuse until the [1830s], see Alschuler, A Peculiar Privilege in Historical Perspective, in The Privilege Against Self-Incrimination, supra, [198], and the first [s]tate to make defendants competent witnesses was Maine, in 1864, see 2 Wigmore, supra, § 579, [701]. In response to these developments, some [s]tates attempted to limit a defendant's opportunity to tailor his sworn testimony by requiring him to testify prior to his own witnesses. See 3 J. Wigmore, Evidence §§ 1841, 1869 (1904); Ky. Stat., ch. 45, § 1646 (1899); Tenn. Code Ann., ch. 4, § 5601 (1896). Although the majority of [s]tates did not impose such a restriction, there is no evidence to suggest they also took the affirmative step of forbidding comment upon the defendant's opportunity to tailor his testimony." *Portuondo* v. *Agard*, supra, 529 U.S. 65–66.

Consistent with this history, in *State* v. *Weatherspoon*, supra, 332 Conn. 545, our Supreme Court explained that the issue of generic tailoring was not addressed in Connecticut until 1996: "Our court *first addressed* the constitutionality of tailoring arguments in *State* v. *Cassidy*, [supra, 236 Conn. 120–29]." (Emphasis added.) We conclude that this factor favors the state.

3

The next *Geisler* factor discussed by the defendant is the persuasive precedents of other states. See *State* v. *McCleese*, supra, 333 Conn. 387. She argues that several states that have considered generic tailoring since the United States Supreme Court decided *Portuondo* barred its use as violative of their state constitution or public policy. The defendant, citing, as examples, *Martinez* v. *People*, 244 P.3d 135 (Colo. 2010) (en banc); *State* v. *Walsh*, 125 Hawaii 271, 260 P.3d 350 (2011); *Commonwealth* v. *Gaudette*, 441 Mass. 762, 808 N.E.2d 798 (2004), which relied on *Commonwealth* v. *Person*, 400 Mass. 136, 508 N.E.2d 88 (1987); *State* v. *Swanson*, 707 N.W.2d 645 (Minn. 2006); *State* v. *Daniels*, supra, 182 N.J. 80; *People* v. *Pagan*, 2 App. Div. 3d 879, 769 N.Y.S.2d 741 (2003); and *State* v. *Wallin*, 166 Wn. App. 364, 269 P.3d 1072 (2012), contends that this factor favors the defendant.

The state responds that the few jurisdictions cited by the defendant either fail to explain their rationale or utilize "conclusory" reasoning, and they often ignore the "legitimate concerns" voiced by the majority in *Portuondo*. Furthermore, the state argues, "only one [state], Hawaii, seems to have [banned generic tailoring] as a matter of state constitutional law." The state contends, therefore, that this *Geisler* factor favors the state. We conclude that, although several states prohibit generic

tailoring, our review of the cases relied on by the defendant reveals that nearly all of them do so on policy, rather than state constitutional, grounds. See also K. Kumor, "State Criminal Procedure Rights: How Much Should the U.S. Supreme Court Influence?," 89 Fordham L. Rev. 931, 939 (2020) ("[O]nly five states have expanded on this federal precedent, and only one has used its state constitution to do so. The five states are Colorado, Hawaii, Massachusetts, Minnesota, and New Jersey, with Hawaii being the only state to rely on its state constitution. All other states with opinions on this issue have conformed to the Supreme Court's holding." (Footnotes omitted.)).

A review of the cases relied on by the defendant confirms the state's argument. In *Commonwealth* v. *Person*, supra, 400 Mass. 139, a case decided before *Portuondo*, the prosecutor had argued to the jury that "because the defendant [had] sat through all the [c]ommonwealth's evidence he was able to fabricate a cover story tailored to answer every detail of the evidence against him . . . ." The Supreme Judicial Court of Massachusetts held that such argument amounted to prosecutorial impropriety because "[t]he defendant is entitled to hear the [c]ommonwealth's evidence and to confront the witnesses against him." Id., 139–40. The court, however, declined to consider the constitutional implications, if any, of the prosecutor's generic tailoring argument. Id., 142 n.7.

Seventeen years after *Person*, the Supreme Judicial Court of Massachusetts decided *Commonwealth* v. *Gaudette*, supra, 441 Mass. 762. In *Gaudette*, which was decided after *Portuondo*, the state requested, in light of *Portuondo*, that the court reconsider its *Person* prohibition on the prosecutor's use of generic tailoring arguments. Id., 763. The court, without considering whether generic tailoring violated the Massachusetts constitution, reaffirmed its holding in *Person*, stating that "it is impermissible for a prosecutor to argue in closing that the jury should draw a negative inference from the defendant's opportunity to shape his testimony to conform to the trial evidence unless there is evidence introduced at trial to support that argument." Id., 767.

In *Martinez* v. *People*, supra, 244 P.3d 136–37, "[d]uring closing rebuttal argument, the prosecutor twice [had] accused the defendant of tailoring his testimony to meet the facts testified to by prior witnesses. The prosecutor did not, however, tie these accusations of tailoring to evidence presented at trial. Rather, the prosecutor said that the defendant's mere presence at trial enabled him to tailor his testimony." Although the defendant objected to this argument, he did not raise a constitutional ground in his objection. Id., 139. The Supreme Court of Colorado, therefore, would not consider whether the prosecutor's argument infringed on the defendant's rights under the Colorado constitution.

Id. Nevertheless, the court held that such argument was improper "as a matter of sound trial practice" due to "constitutional concerns." Id., 141.

In *State* v. *Daniels*, supra, 182 N.J. 88, 98, the Supreme Court of New Jersey, although not ruling on whether generically tailored comments by the prosecutor were "constitutionally permissible" concluded that "[p]rosecutorial comment suggesting that a defendant tailored his testimony inverts [several constitutional] rights, permitting the prosecutor to punish the defendant for exercising that which the [c]onstitution guarantees." The court also opined that generic tailoring arguments "undermine the core principle of our criminal justice system—that a defendant is entitled to a fair trial"— and "debase the truth-seeking function of the adversary process, violate the respect for the defendant's individual dignity, and ignore the presumption of innocence that survives until a guilty verdict is returned. . . . We simply cannot conclude that generic accusations are a legitimate means to bring about a just conviction. . . . Therefore, pursuant to our supervisory authority, we hold that prosecutors are prohibited from making generic accusations of tailoring during summation." (Citations omitted; internal quotation marks omitted.) Id., 98. The court, thereafter, held that such argument is prohibited during cross-examination as well. Id., 99.

Similarly, in *State* v. *Swanson*, supra, 707 N.W.2d 657–58, the Minnesota Supreme Court concluded: "We believe, however, that although not constitutionally required, the better rule is that the prosecution cannot use a defendant's exercise of his right of confrontation to impeach the credibility of his testimony, at least in the absence of evidence that the defendant has tailored his testimony to fit the state's case." The court noted that the Supreme Judicial Court of Massachusetts had taken the same approach in *Gaudette*. Id., 658 n.2.

The only case offered by the defendant that clearly held that generic tailoring violated the state constitution is *State* v. *Walsh*, supra, 125 Hawaii 286–87.[5] In *Walsh*, "the prosecutor [had] accused [the defendant] of tailoring his testimony when, in discussing credibility, she argued that [the defendant] benefitted from hearing the testimony of the other witnesses before he testified. Manifestly the prosecutor's remarks drew the jury's attention to [the defendant's] presence at trial and his resultant opportunity to tailor his testimony . . . ." (Internal quotation marks omitted.) Id., 286. The Supreme Court of Hawaii held in relevant part: "(1) in the criminal trial of a defendant, the prosecution's statements that a testifying defendant benefitted from his trial presence and, thus, is less credible because he heard the testimony of other witnesses . . . constitute[s] prohibited generic tailoring arguments; (2) prohibited generic tailoring arguments are reviewable as plain error inasmuch as they affect a defendant's sub-

stantial constitutional rights; (3) standard jury instructions regarding witness testimony and counsel's arguments do not cure such improper arguments; (4) accordingly, whenever a defendant testifies, the jury must be instructed that the defendant has a right to be present during trial; and (5) in this case the error is not harmless beyond a reasonable doubt." (Internal quotation marks omitted.) Id., 274. The court explained: "[U]pholding a defendant's rights under the confrontation clause is essential to providing a defendant with a fair trial . . . and . . . a prosecutor's comments may not infringe on a defendant's constitutional rights . . . . The right of confrontation is a substantial right. . . . The confrontation right provides the criminal defendant with the opportunity to defend himself [or herself] through our adversary system by prohibiting ex parte trials, granting the defendant an opportunity to test the evidence in front of a jury, and guaranteeing the right to face-to-face confrontation. . . .

"Generic accusations of tailoring also discourage a defendant from exercising his constitutional right to testify[6] on his own behalf. . . . Additionally, [i]t is well settled that an accused has a fundamental right to be present at each critical stage of the criminal proceeding. . . . The right of a criminal defendant to be present at his trial is of no less than constitutional magnitude, and is founded upon the [c]onfrontation and [d]ue [p]rocess clauses of both the United States and Hawaii [c]onstitutions. . . . It is a right of fundamental importance." (Citations omitted; emphasis omitted; footnote in original; internal quotation marks omitted.) Id., 284–85.

Although all of these cases speak to constitutional issues and concerns, with the exception of *Walsh* and *Wallin*, none of them relies on a state constitution to support the prohibition of generic tailoring arguments or questions. Rather, they rely on the supervisory authority of those courts and on public policy grounds. Furthermore, as demonstrated by the cases discussed herein, *Walsh* and *Wallin* appear to represent a minority of states that have chosen to depart from *Portuondo* in some fashion. We conclude, therefore, that this factor favors the state.

4

The next *Geisler* factor that the defendant discusses is the persuasive relevant federal precedents. See *State* v. *McCleese*, supra, 333 Conn. 387. The defendant concedes that the United States Supreme Court in *Portuondo* held that "generic tailoring arguments do not violate the federal constitution" and that, therefore, this factor favors the state. See *Portuondo* v. *Agard*, supra, 529 U.S. 73. We agree.

5

The fifth factor briefed by the defendant concerns related Connecticut precedent. See *State* v. *McCleese*,

supra, 333 Conn. 387. In her main appellate brief, the defendant argues, in toto: "The first time this issue came up in Connecticut was in *Cassidy*, where this court strongly disapproved of generic tailoring arguments because [i]nviting the fact finder to draw an inference adverse to a defendant solely on account of the defendant's assertion of a constitutional right impermissibly burdens the free exercise of that right and, therefore, may not be tolerated. [*State* v. *Cassidy*, supra, 236 Conn. 127]. However, the court in [*State* v.] *Alexander*, [supra] 254 Conn. 290, overruled *Cassidy*. Subsequent attempts to revisit this issue were unsuccessful. *State* v. *Perez*, [78 Conn. App. 610, 629, 828 A.2d 626 (2003), cert. denied, 271 Conn. 901, 859 A.2d 565 (2004)]; *State* v. *Papantoniou*, [supra, 185 Conn. App. 93].[7] Recently, as discussed in more detail above, [our Supreme Court] readdressed this issue [in] *Weatherspoon*, where [the] court indicated that, should the practice of generic tailoring arguments persist, a rule prohibiting them may become necessary. [*State* v. *Weatherspoon*, supra] 332 Conn. 554. Based upon the decision in *Weatherspoon*, this factor favors the defendant." (Footnote added; internal quotation marks omitted.) The state concedes that this factor "appears to favor the defendant." We agree.

In *Weatherspoon*, our Supreme Court explained: "[We] first addressed the constitutionality of tailoring arguments in *State* v. *Cassidy*, [supra, 236 Conn. 120–29]. We held in *Cassidy* that generic tailoring arguments violate the sixth amendment's confrontation clause . . . but specific tailoring arguments are constitutionally permissible because they are linked solely to the evidence and not, either directly or indirectly, to the defendant's presence at trial. . . . This court's reasoning was straightforward: Inviting the fact finder to draw an inference adverse to a defendant solely on account of the defendant's assertion of a constitutional right impermissibly burdens the free exercise of that right and, therefore, may not be tolerated. . . . *Cassidy*, however, reassured the state that the prohibition against generic tailoring arguments did not prevent the prosecution from aggressively attacking a testifying defendant's credibility. We stated that the prosecutor, in his closing argument . . . was not free to assert that the defendant's presence at trial had enabled him to tailor his testimony to that of other witnesses. Such argument exceeded the bounds of fair comment because it unfairly penalized the defendant for asserting his constitutionally protected right to confront his accusers at trial. . . .

"Four years later, the sixth amendment underpinning of *Cassidy* was removed when the United States Supreme Court held that generic tailoring arguments do not violate any federal constitutional rights. *Portuondo* v. *Agard*, supra, 529 U.S. 75–76. In *Portuondo* . . . [t]he court pointed out that generic tailoring argu-

ments pertain to the defendant's credibility as a witness, and [are] therefore in accord with our [long-standing] rule that when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness. . . .

"The *Portuondo* majority emphasized that its ruling was limited to federal constitutional grounds and did not address whether generic tailoring arguments were always desirable as a matter of sound trial practice, which, the court explained, was an inquiry best left to trial courts, and to the appellate courts which routinely review their work. . . . This caveat also was noted in a concurrence by Justice Stevens, in which he expressed the view that generic tailoring arguments should be discouraged rather than validated, and emphasized that the majority's holding does not, of course, deprive [s]tates or trial judges of the power . . . to prevent such argument[s] altogether. . . .

"Because *Cassidy* was decided under the federal constitution, *Portuondo* required us to overrule its holding, which we did in *State* v. *Alexander*, supra, 254 Conn. 296. We stated in *Alexander* that generic tailoring comments on the defendant's presence at trial and his accompanying opportunity to fabricate or tailor his testimony were permissible under the federal constitution. . . . Although the defendant in *Alexander* raised a state constitutional claim through supplemental briefing, this court was not persuaded by his argument." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Weatherspoon*, supra, 332 Conn. 545–47.

The court further explained: "Although the present case does not require us to decide at this time whether to adopt a formal rule prohibiting generic tailoring arguments as an exercise of our supervisory authority, such a rule may become necessary if future cases reveal that tailoring arguments are being made indiscriminately and without an appropriate evidentiary basis. Likewise, the fact that generic tailoring arguments do not burden federal constitutional rights does not mean that they pass constitutional muster under our state constitution. We express no view on these issues, but observe that a number of our sister states have determined that generic tailoring arguments are impermissible as a matter of sound trial practice or state law." Id., 554.

Although this history indicates that it may be time for us to exercise our supervisory authority to prohibit generic tailoring arguments or cross-examination in criminal cases, we conclude that this history does not necessarily demonstrate that our appellate courts, after *Portuondo*, consider this a matter of state constitutional law. Nevertheless, because it is obvious that we have recognized in our case law the possibility that such generic tailoring arguments and questions on cross-examination during a criminal trial potentially could

impact a defendant's state constitutional rights, we conclude that this factor, on balance, slightly favors the defendant.

### 6

The final *Geisler* factor briefed by the defendant requires us to consider relevant public policies, including economical and sociological considerations. See *State* v. *McCleese*, supra, 333 Conn. 387. The defendant argues that generic tailoring comments violate Connecticut public policy, stating: "As [B.] Gershman's Prosecutorial Misconduct § 11.16 (2d Ed. 2015) warns, a generic tailoring insinuation may impinge on a defendant's right to take the stand and his right to confront witnesses because the comment implies that a truthful defendant would have stayed out of the courtroom before testifying. Furthermore, the argument violates the defendant's right to testify because the state can only make the argument when the defendant takes the stand." (Internal quotation marks omitted.) She also argues in her reply brief that "[t]elling the jury that it may . . . use the defendant's presence to find her less believable sends [a] . . . message . . . that her presence [at her criminal trial] means she is less believable. . . . [This] tie[s] the defendant's credibility to her presence at trial, burdening her rights to confront and testify. . . . Mentioning that the defendant was the only witness to watch the other witnesses exacerbates the problem because it implies that the other witnesses are automatically more believable because they were sequestered." (Citations omitted.)

Although we agree in part with the defendant's argument concerning the implications of generic tailoring on the jury's perception of the defendant during her criminal trial; see part IV of this opinion; we are not persuaded, in light of our analysis in parts I B 1 through 5 of this opinion, by the defendant's argument that public policy considerations compel a conclusion that generic tailoring violates our state constitution.

### C

On the basis of our analysis of the *Geisler* factors, the defendant has not persuaded us that article first, § 8, of the Connecticut constitution affords greater protection than its federal counterparts, the fifth and sixth amendments, on the issue of generic tailoring as to the defendant's right of confrontation and her right to testify on her on own behalf. Consequently, her claim that the prosecutor's generic tailoring comments violated her rights under the article first, § 8, of our state constitution fails.

### II

The defendant next claims that the prosecutor violated her federal and state constitutional rights to due process of law[8] when, during cross-examination, she asked the defendant whether she had a vested interest

in the outcome of the trial, and when, during rebuttal, the prosecutor told the jury that it could consider the defendant's vested interest in the outcome of the trial. She argues that "[t]hese questions and comments improperly infringed upon the defendant's presumption of innocence. Furthermore, they are contrary to the rule of *State* v. *Medrano*, 308 Conn. 604, [629–31, 65 A.3d 503] (2013), in which the court, under its supervisory powers, instructed the trial courts not to instruct the jury as to the defendant's special interest in the outcome of the case. This error was not harmless and this court must overturn the defendant's convictions on that basis." Because this claim is unpreserved, the defendant requests *Golding* review. See footnote 3 of this opinion. The defendant's claim fails under the third prong of *Golding*.

The following additional facts are relevant to our discussion. During cross-examination of the defendant, the following colloquy occurred:

"[The Prosecutor]: And you have a lot riding on this case, don't you?

"[The Defendant]: Today?

"[The Prosecutor]: Sure.

"[The Defendant]: Well, yeah. I have my son, my apartment. I have a life. My son is everything to me." The defendant did not object.

During the prosecutor's summation, it argued to the jury, inter alia, that the defendant had a "vested interest in the outcome of this case. And that can also be taken into account when you're deliberating this case." The defendant did not object to this argument.

On appeal, the defendant claims that the prosecutor violated her right to due process of law and that such questions and comments violate the spirit of *Medrano*, which, she argues, should be read to include an implied prohibition on the prosecutor telling the jury that the defendant has a vested interest in the outcome of the case, in addition to its explicit prohibition on such statements in the context of the trial court's jury instructions.

In *Medrano*, our Supreme Court considered, in relevant part, whether the defendant had been deprived of his right to a fair trial and to present a defense when the trial court instructed the jury that it could consider whether the defendant had an interest in the outcome of the case when assessing the credibility of his trial testimony. *State* v. *Medrano*, supra, 308 Conn. 624–25. The court held that the instruction "was not unduly repetitive, nor did it transcend the bounds of evenhandedness." Id., 626. Nevertheless, because such an instruction "could give rise to a danger of juror misunderstanding," the court employed its supervisory authority over the administration of justice by directing the trial court, in the future, "to refrain from instructing jurors,

when a defendant testifies, that they may specifically consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial." Id., 630–31; see also *State* v. *Courtney G.*, Conn. , n.9, A.3d (2021) (explaining holding in *Medrano*).

In the present case, the defendant has not persuaded us that the questions and argument of the prosecutor implicated her right to due process of law. Our Supreme Court in *Medrano* held that the trial court's instructions, specifically telling the jury that it could consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial, did not implicate the defendant's right to due process of law. *State* v. *Medrano*, supra, 308 Conn. 625. The defendant in the present case has failed to persuade us that a prosecutor's similar *argument* could have more of an implication on the defendant's right to due process of law than a court's jury instructions.

In the alternative, the defendant requests that we employ our supervisory authority to expand on our Supreme Court's decision in *Medrano* by making the prohibition set forth therein applicable to comments by prosecutors. We will discuss the use of our supervisory authority over the administration of justice in part IV of this opinion.

III

The defendant also claims that the prosecutor committed improprieties that deprived her of a fair trial when she argued that the defendant had tailored her testimony, implied that she had a motive to lie, and infringed on her right to the presumption of innocence. Having concluded in parts I and II of this opinion that the questions and argument of the prosecutor did not infringe on the defendant's constitutional rights, we need not consider this claim further. See id., 610 ("[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.)). The defendant has failed to establish her claim.

IV

We next consider the defendant's requests that we employ our supervisory authority over the administration of justice to prohibit the prosecutor from making generic tailoring arguments and comments and that we expand on our Supreme Court's decision in *Medrano* to prohibit the prosecutor from making "interest in the outcome" arguments about the defendant.[9] As for prosecutorial argument on the defendant's "interest in the outcome" of her criminal trial, the defendant has failed to persuade us that such argument merits the exercise

of our supervisory authority. See *State* v. *Courtney G.*, supra, Conn. n.9. On the issue of generic tailoring, we agree to exercise our supervisory authority over the administration of justice to prohibit such questions and arguments because they are likely to implicate the perceived fairness of the judicial system and they could give rise to a danger of juror misunderstanding.

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process." (Internal quotation marks omitted.) *State* v. *Weatherspoon*, supra, 332 Conn. 552. "The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . .

"We recognize that this court's supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Rather, the rule invoking our use of supervisory power is one that, as a matter of policy, is relevant to the perceived fairness of the judicial system as a whole, most typically in that it lends itself to the adoption of a procedural rule that will guide lower courts in the administration of justice in all aspects of the [adjudicatory] process. . . . Indeed, the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of [this court's] supervisory powers." (Citations omitted; internal quotation marks omitted.) *In re Yasiel R.*, supra, 317 Conn. 789–90.

"Generally, cases in which we have invoked our supervisory authority for rule making have fallen into two categories . . . . In the first category are cases wherein we have utilized our supervisory power to articulate a procedural rule as a matter of policy, either as [a] holding or dictum, but without reversing [the underlying judgment] or portions thereof. . . . In the second category are cases wherein we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal." (Internal quotation marks omitted.) *State* v. *Weatherspoon*, supra, 332 Conn. 552–53; id. (deciding it was unnecessary to consider defendant's request for exercise of supervisory authority because prosecutor's tailoring argument was specific rather than generic).

### A

The defendant requests that we employ our supervisory authority over the administration of justice to

expand on our Supreme Court's decision in *Medrano* to prohibit the prosecutor from employing "interest in the outcome" questions and arguments about a defendant who exercises her or his right to testify. She argues that " '[i]nterest in the outcome' arguments apply to both guilty and innocent defendants and therefore are of minimal value in assessing the defendant's credibility. Furthermore, [the] court in *Medrano* banned jury instructions that emphasize the defendant's interest in the outcome of the case, and it significantly defeats the purpose of this rule to then allow the state to argue about the defendant's interest in the outcome and tell the jury that it may take that interest into consideration." We are not persuaded by the defendant's arguments in support of this request.

In *Medrano*, our Supreme Court held that the trial court's instructions, telling the jury that it could consider the defendant's interest in the outcome of the case and the importance to him of the outcome of the trial, did not implicate the defendant's right to due process of law but that they could give rise to a danger of juror misunderstanding. *State* v. *Medrano*, supra, 308 Conn. 629–31. In the present case, the defendant's attempts to equate the court's instructions with the argument of the prosecutor are not persuasive. In cases where a criminal defendant has taken the witness stand, the jury is well aware that the defendant is the one on trial and that he or she has an interest in the outcome of the case. The argument of the prosecutor, reminding the jury that the defendant has an interest does not carry the inherent danger of misunderstanding that a judge's instruction would have on the jury. As our Supreme Court recently noted: "Our holding in *Medrano* was predicated on the trial court's role as a neutral and detached arbiter of justice and its duty to instruct the jurors on the law in a fair, impartial, and dispassionate manner. Although a prosecutor is a minister of justice . . . she is not neutral, detached, impartial, or dispassionate. Instead, a prosecutor is an advocate with a professional obligation to argue zealously, albeit fairly, on behalf of the state." (Citation omitted.) *State* v. *Courtney G.*, supra, Conn. n.9. The jury understands the difference between advocacy by the state on one hand and an instruction of law by the court on the other, which it is told it must follow. The argument of counsel is just that, argument, and the jury in the present case specifically was instructed as such. Accordingly, we are not persuaded by the defendant's argument.

B

The defendant also requests that, for policy reasons, we employ our supervisory authority over the administration of justice to prohibit the prosecutor from making generic tailoring arguments. She argues that if we were to prohibit such remarks, "[t]he prosecutor would still

be free to challenge a defendant's overall credibility by making specific tailoring arguments. In closing, the prosecutor could comment on the defendant's testimony, and how it matched or conflicted with other evidence. The prosecutor [however] could not refer explicitly to the fact that the defendant was in the courtroom or that he [or she] heard the testimony of other witnesses, and was thus able to tailor his [or her] testimony. . . . This is a rule that can be readily fashioned and easily followed in a trial setting." (Citation omitted; internal quotation marks omitted.) We agree that there are important public policy reasons that make it necessary for us to employ our supervisory authority over the administration of justice to set forth a procedure to ensure that prosecutors make only specific and not generic tailoring remarks during a criminal trial.

In reaching this conclusion, we are guided by the rationale that our Supreme Court has set forth for the exercise of appellate supervisory authority. "We deem it appropriate, in light of concerns of fundamental fairness, to consider the substance of this issue pursuant to our supervisory authority for the purpose of providing guidance to trial courts in future cases. As an appellate court, we possess an inherent supervisory authority over the administration of justice. . . . The standards that we set under this supervisory authority are not satisfied by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . We previously have exercised our supervisory powers to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Citations omitted; internal quotation marks omitted.) *Duperry* v. *Solnit*, 261 Conn. 309, 326–27, 803 A.2d 287 (2002); id., 329–31 (employing supervisory authority to enact new rule mandating that trial court must canvass defendant who, with no contestation by prosecutor, pleads not guilty by reason of insanity, but declining to apply that rule to present case); see also *State* v. *Carrion*, 313 Conn. 823, 847–49, 100 A.3d 361 (2014) (although defendant failed to prove that jury charge deprived him of fair trial, our Supreme Court exercised its supervisory authority over administration of justice to direct trial court to refrain from giving that particular instruction in future).

In *Carrion*, our Supreme Court explained that "the cases in which this court has invoked its supervisory authority can be divided into two different categories. In the first category are cases [in which] we have utilized our supervisory power[s] to articulate a procedural rule as a matter of policy, either as holding or dictum, but without reversing convictions or portions thereof. In the second category are cases [in which] we have uti-

lized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal. Although we . . . have noted that [o]ur cases have not always been clear as to the reason for this distinction . . . a review of the cases in both categories demonstrates that, in contrast to the second category, the first category consists of cases [in which] there was no perceived or actual injustice apparent on the record, but the facts of the case lent themselves to the articulation of prophylactic procedural rules that might well avert such problems in the future. . . .

"For purposes of the second category of cases—cases in which we reverse a conviction—the defendant must establish that the invocation of our supervisory authority is truly necessary because [o]ur supervisory powers are not a last bastion of hope for every untenable appeal. . . . In such circumstances, the exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of [the] utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Because [c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system, this court will invoke its supervisory powers to reverse a conviction only in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts. . . . This demanding standard is perfectly appropriate when we are asked to reverse a conviction under our supervisory powers.

"The first category of cases, however, presents an entirely different set of circumstances. We invoke our supervisory authority in such a case . . . not because the use of that authority is necessary to ensure that justice is achieved in the particular case. Rather, we have determined that the defendant in that case received a fair trial and therefore is not entitled to the extraordinary remedy of a new trial. Nevertheless, it may be appropriate, in such circumstances, to direct our trial [judges] to conduct themselves in a particular manner so as to promote fairness, both perceived and actual, *in future cases*. As we tacitly have recognized by invoking our supervisory authority in such cases, because we are not imposing any remedy in the case [on appeal]—let alone the extraordinary remedy of a new trial—there is no need for this court to justify the use of extraordinary measures prior to exercising its supervisory authority. Rather . . . we are free to invoke our supervisory authority prospectively when prudence and good sense so dictate." (Citations omitted; emphasis altered; internal quotation marks omit-

ted.) *State* v. *Carrion*, supra, 313 Conn. 850–52; see also *State* v. *Elson*, 311 Conn. 726, 768–70 n.30, 91 A.3d 862 (2014). This is such a case.

First, this case does not fit into the second category of cases requiring the extraordinary remedy of a retrial because the record reflects that the generic tailoring comments of the prosecutor did not affect the fairness of the defendant's trial. The defendant admitted to driving while her license was under suspension, and, as to the crimes of driving while under the influence of intoxicating drugs or alcohol and attempt to commit risk of injury to a child, the evidence demonstrates that the people with whom she had come into contact at the day care believed that her behavior and demeanor exhibited intoxication, that she failed the field sobriety tests that were administered, and that she was unsteady on her feet and confused. Furthermore, Divenere testified that the medication Xanax is used for anxiety and panic disorders and that the defendant told him that she was taking Xanax, although she did not admit to having taken it that day. Divenere also testified that "Xanax can impair one's ability to drive," and that, after the defendant tested negative for alcohol, he asked her to provide a urine sample so that he could test for drugs, but she refused. The jury reasonably could infer from the defendant's refusal to provide the requested urine sample that she was concerned that such a sample would show the presence of Xanax in her system. Furthermore, the prosecutor's generic tailoring comments were limited in nature, compromising only a few questions and only three sentences of the prosecutor's rebuttal argument. Because we have concluded that generic tailoring does not implicate the defendant's constitutional rights, the burden to prove any harm from the prosecutor's use of generic tailoring is on the defendant, and she has failed to prove that the prosecutor's limited use of generic tailoring during her criminal trial was harmful.

Despite our conclusion that the prosecutor's generic tailoring comments did not prejudice the defendant, we are convinced that, to ensure the perceived and actual fairness of trials in the future, generic tailoring arguments should be avoided. Under our criminal justice system, a defendant has both federal and state constitutional rights, including the rights to be present at trial, to confront the state's witnesses, to call witnesses and present evidence, and to testify, or to not testify, on his or her own behalf. See U.S. Const., amends. V, VI and XIV; Conn. Const., art. I, § 8. "[A] criminal defendant is not simply another witness. Those who face criminal prosecution possess fundamental rights that are essential to a fair trial. *Pointer* v. *Texas*, 380 U.S. 400, 403, [85 S. Ct. 1065, 13 L. Ed. 2d 923] (1965) . . . . Indeed, a criminal defendant has the right to be present at trial, see *Illinois* v. *Allen*, 397 U.S. 337, 338, [90 S. Ct. 1057, 25 L. Ed. 2d 353] (1970), to be confronted with the

witnesses against him and to hear the [s]tate's evidence, see *Pointer* [v. *Texas*], supra, [403], to present witnesses and evidence in his defense, see *Washington* v. *Texas*, 388 U.S. 14, 18–19, [87 S. Ct. 1920, 18 L. Ed. 2d 1019] (1967), and to testify on his own behalf, see *Rock* v. *Arkansas*, 483 U.S. 44, 49, [107 S. Ct. 2704, 97 L. Ed. 2d 37] (1987)." (Internal quotation marks omitted.) *State* v. *Daniels*, supra, 182 N.J. 97–98.

Under our rules of practice, a criminal defendant is required to be present at his or her criminal trial, unless excused under Practice Book § 44-8.[10] Additionally, the order of the presentation of evidence at a criminal trial, unless there is cause to permit otherwise, *must proceed* as follows: "(1) The prosecuting authority shall present the case-in-chief. (2) The defendant may present a case-in-chief. (3) The prosecuting authority and the defendant may present rebuttal evidence in successive rebuttals, as required. The judicial authority for cause may permit a party to present evidence not of a rebuttal nature, and if the prosecuting authority is permitted to present further evidence in chief, the defendant may respond with further evidence in chief. (4) The prosecuting authority shall be entitled to make the opening and final closing arguments. (5) The defendant may make a single closing argument following the opening argument of the prosecuting authority." Practice Book § 42-35; see also General Statutes § 54-88. Accordingly, for a defendant to exercise his or her rights to be present at trial and to confront that state's witnesses, he or she necessarily must sit through the state's case *before* exercising the right to testify. See Practice Book § 42-35. That is the way our system is designed.

Although the United States Supreme Court in *Portuondo* declined to recognize a federal constitutional prohibition against a prosecutor making comments concerning a testifying defendant's opportunity to tailor his or her testimony because of his or her mere presence in the courtroom during the state's case, the "*Portuondo* majority emphasized that its ruling was limited to federal constitutional grounds and did not address whether generic tailoring arguments were always desirable as a matter of sound trial practice, which, the court explained, was an inquiry best left to trial courts, and to the appellate courts which routinely review their work. *Portuondo* v. *Agard*, supra, 529 U.S. 73 n.4. This caveat also was noted in a concurrence by Justice Stevens, in which he expressed the view that generic tailoring arguments should be discouraged rather than validated, and emphasized that the majority's holding does not, of course, deprive [s]tates or trial judges of the power . . . to prevent such argument[s] altogether. Id., 76." (Internal quotation marks omitted.) *State* v. *Weatherspoon*, supra, 332 Conn. 546–47.

"Justice Ginsburg dissented in *Portuondo* on the basis of her belief that generic tailoring arguments in closing

arguments unduly burden a defendant's sixth amendment right to be present at trial and to confront the accusers against him, and do not aid the jury in its truth-seeking function because a prosecutorial comment . . . tied only to the defendant's presence in the courtroom and not to his actual testimony does not assist the jury in sort[ing] those who tailor their testimony from those who do not, much less the guilty from the innocent. [*Portuondo* v. *Agard*, supra, 529 U.S. 77–78]." (Internal quotation marks omitted.) *State* v. *Weatherspoon*, supra, 332 Conn. 547 n.8. Justice Ginsburg contended, instead, that the majority was "transform[ing] a defendant's presence at trial from a [s]ixth [a]mendment right into an automatic burden on his credibility." *Portuondo* v. *Agard*, supra, 76 (Ginsburg, J., dissenting).

Our Supreme Court in *Weatherspoon* carefully explained that "a tailoring argument does not automatically become appropriate just because a defendant chooses to testify in his or her criminal trial, and *prosecutors and trial courts must take care to ensure that any such argument is tied expressly and specifically to evidence that actually supports the inference of tailoring*. It is true that the United States Supreme Court held in *Portuondo* that tailoring arguments do not violate the sixth amendment, but the court made equally clear, however, that state courts may prohibit or limit tailoring arguments by local decree as a matter of sound trial practice. See [id.] 73 n.4; id., 76 (Stevens, J., concurring)." (Emphasis added.) *State* v. *Weatherspoon*, supra, 332 Conn. 553–54.

Although the United States Supreme Court has determined that generic tailoring arguments are not violative of the federal constitution, and our appellate courts, since shortly after *Portuondo*; see *State* v. *Alexander*, supra, 254 Conn. 295–96 (overruling *State* v. *Cassidy*, supra, 236 Conn. 112); have not been persuaded that such arguments are violative of the Connecticut constitution, we, nonetheless, agree with the defendant that these remarks should be prohibited because they are likely to implicate the perceived fairness of the judicial system and they could give rise to a danger of juror misunderstanding.

In *State* v. *Cassidy*, supra, 236 Conn. 120, our Supreme Court determined that generic tailoring arguments, made by the prosecutor during closing argument to the jury, "invited the jury to draw an inference adverse to the defendant solely because he asserted his constitutional right to be present at trial and, consequently, that those comments unreasonably interfered with the defendant's free exercise of that right." The court explained: "The right to confrontation is fundamental to a fair trial under both the federal and state constitutions. *Pointer* v. *Texas*, [supra, 380 U.S. 403]; *State* v. *Jarzbek*, 204 Conn. 683, 707, 529 A.2d 1245 (1987) [cert. denied,

484 U.S. 1061, 108 S. Ct. 1017, 98 L. Ed. 2d 982 (1988)]; *State* v. *Reardon*, 172 Conn. 593, 599–600, 376 A.2d 65 (1977). It is expressly protected by the sixth and fourteenth amendments to the United States constitution; *Davis* v. *Alaska*, 415 U.S. 308, 315, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *Pointer* v. *Texas*, supra, [403]; and by article first, § 8, of the Connecticut constitution. *State* v. *Torello*, 103 Conn. 511, 513, 131 A. 429 (1925). *State* v. *Hufford*, 205 Conn. 386, 400–401, 533 A.2d 866 (1987). The right of physical confrontation is a . . . fundamental component of the [federal and state confrontation] clauses . . . *State* v. *Jarzbek*, supra, 692; and guarantees an accused the right to be present in the courtroom at every stage of his trial. *Illinois* v. *Allen*, 397 U.S. 337, 338, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970).

"Like cross-examination, face-to-face confrontation [at trial] . . . ensure[s] the integrity of the [fact-finding] process . . . *Coy* v. *Iowa*, 487 U.S. 1012, 1019–20, 108 S. Ct. 2798, 101 L. Ed. 2d 857 (1988); because [i]t is always more difficult to tell a lie about a person to his face than behind his back. Id., 1019. Thus, [i]t is widely recognized that physical confrontation contributes significantly, albeit intangibly, to the truth-seeking process . . . . In addition, physical confrontation furthers other goals of our criminal justice system, in that it reflects respect for the defendant's dignity and the presumption of innocence until proven guilty. *State* v. *Jarzbek*, supra, 204 Conn. 695. Indeed, the literal right to confront one's accusers is so deeply rooted in human feelings of what is necessary for fairness [that] the right of confrontation contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. *Coy* v. *Iowa*, supra, 1018–19, quoting *Lee* v. *Illinois*, 476 U.S. 530, 540, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986). Because of the important goals furthered by an accused's right to encounter adverse witnesses face-to-face, the free exercise of that right may not be impaired absent a compelling justification for the infringement. See, e.g., *Maryland* v. *Craig*, 497 U.S. 836, 850, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990) (defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured); *State* v. *Jarzbek*, supra, 704–705 (exclusion of defendant during testimony of minor victim of sexual assault warranted only upon clear and convincing showing by state of compelling need to do so)." (Emphasis omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Cassidy*, supra, 236 Conn. 122–24.

Although our Supreme Court overruled *Cassidy* in *State* v. *Alexander*, supra, 254 Conn. 296, it did so in light of *Portuondo*; see id., 296, 299–300; and it was not

asked to use its supervisory authority to ban generic tailoring arguments. Nevertheless, the concerns regarding the use of generic tailoring expressed by the court in *Cassidy* have not gone away since *Portuondo* and have led a number of state appellate courts to use their supervisory authority to prohibit such arguments. We join those courts today.

In particular, we agree with the New Jersey Supreme Court that "[p]rosecutorial comment suggesting that a defendant tailored his testimony inverts [her rights to be present at trial, confront the witnesses presented against her and to hear the state's case], permitting the prosecutor to punish the defendant for exercising that which the [c]onstitution guarantees. Although, after *Portuondo*, prosecutorial accusations of tailoring are permissible under the [f]ederal [c]onstitution, we nonetheless find that they undermine the core principle of our criminal justice system—that a defendant is entitled to a fair trial." *State* v. *Daniels*, supra, 182 N.J. 98. We also are mindful that our Supreme Court in *Weatherspoon* noted the importance of tying a tailoring argument *specifically* to evidence that gives rise to an inference of tailoring. See *State* v. *Weatherspoon*, supra, 332 Conn. 544. When it did so, the court also stated: "Our approval of specific tailoring arguments should not be taken as a blanket approval of all tailoring arguments. . . . Although the present case does not require us to decide at this time whether to adopt a formal rule prohibiting generic tailoring arguments as an exercise of our supervisory authority, such a rule may become necessary if future cases reveal that tailoring arguments are being made indiscriminately and without an appropriate evidentiary basis." (Citation omitted.) Id., 553–54. Thus, although our Supreme Court did not address explicitly the propriety of generic tailoring arguments, it made clear that it remains concerned, even after *Alexander*, about the use of such arguments. We conclude that the present case, which does involve generic tailoring arguments by the prosecutor, requires us to decide whether to exercise our supervisory authority, and, for the reasons set forth in this part IV B, we do so to prohibit generic tailoring arguments at all future criminal trials.

In announcing this new rule of procedure, we recognize that the line between generic and specific tailoring arguments is not always clear. For this reason, we set forth the following procedure to be used if the state wishes to make a tailoring argument. Prior to asking questions on cross-examination of the defendant that suggest that the defendant has tailored his or her testimony or before making such comments in closing arguments, the prosecutor shall alert the defendant and the court of the intention to do so. If the defendant objects to such cross-examination or comments, the court must rule on whether the proposed questions or comments constitute generic or specific tailoring. If the court con-

cludes that the cross-examination or comments constitute specific tailoring because they are tied to specific evidence that gives rise to an inference that the defendant has tailored his or her testimony, the questions or comments, unless otherwise improper, should be permitted. If the court concludes that the questions or comments constitute generic tailoring, they shall be prohibited. In addition, to the extent that the court permits a specific tailoring argument to be made, the defendant may request that the court instruct the jury during its final charge that the defendant had an absolute right to be present throughout the entire trial and that the jury may not draw an inference that the defendant's testimony is not credible simply because the defendant was present during the trial. The trial court shall include such a charge in its final charge to the jury if it is requested. This procedure strikes the appropriate balance of ensuring that the state is not deprived of the opportunity to ask questions or make comments based on the evidence, while at the same time ensuring that the defendant's rights to be present at his or her criminal trial and to confront the state's witnesses are not burdened by a suggestion that he or she has taken unfair advantage by exercising those rights.

V

The defendant's final claim is that her conviction of attempt to commit risk of injury to a child should be vacated because it is not a cognizable crime. The defendant, although requesting review pursuant to *State* v. *Golding*, supra, 213 Conn. 239–40; see footnote 3 of this opinion; concedes that "the Appellate Court cannot overrule a Supreme Court case and, therefore, [she] makes this argument for the sake of future review." We conclude, as recognized by the defendant, that we are bound by our Supreme Court's decision in *State* v. *Sorabella*, 277 Conn. 155, 172–74, 891 A.2d 897 (rejecting claim that "attempt to commit risk of injury to a child . . . is not a cognizable offense"), cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). Accordingly, the defendant has preserved this issue should our Supreme Court wish to revisit its decision. She, nonetheless, cannot prevail on that claim in this appeal.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] After Divenere arrested the defendant, a staff member of the day care telephoned the defendant's grandmother, who picked up the child.

[2] The court instructed the jury that it could draw an adverse inference from the defendant's refusal but that it was not required to do so. The court instructed: "Evidence was presented that after the defendant submitted to a breath test, she refused to submit to a urine test. If you find that the defendant did refuse to submit to the urine test, you may make any reasonable inference that follows from that fact, but you are not required to do so."

[3] "Pursuant to *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met:

(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. . . . *State* v. *Golding*, supra, 213 Conn. 239–40; see also *In re Yasiel R.*, [supra, 317 Conn. 781] (modifying third prong of *Golding*)." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Weatherspoon*, 332 Conn. 531, 548 n.9, 212 A.3d 208 (2019). "The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Internal quotation marks omitted.) *State* v. *Papantoniou*, 185 Conn. App. 93, 102–103, 196 A.3d 839, cert. denied, 330 Conn. 948, 196 A.3d 326 (2018).

[4] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . [and] to be confronted by the witnesses against him . . . . No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law . . . ."

[5] In *State* v. *Wallin*, supra, 166 Wn. App. 376–77, the Court of Appeals of Washington reversed the defendant's conviction because the prosecutor had made a generic tailoring argument. In doing so, the court noted that "*Mattson* (Hawaii), *Daniels* (New Jersey), and *Swanson* (Minnesota) are helpful." Id., 376. The court further noted that the *Mattson* decision was based on an analysis of the Hawaii constitution, whereas the courts in *Daniels* and *Swanson* relied "on their ability to fashion a trial practice rule, which is not something that we could do." Id. Thus, it appears that the court in *Wallin* relied on the Washington constitution in reaching its conclusion, although it did not engage in a substantive analysis of the relevant provisions of its state constitution.

[6] "The right of a defendant to testify is guaranteed by sections 5, 14, and 10 of article I of the Hawaii Constitution. . . . The right is essential to due process of law as guaranteed under section 5 of article 1. . . . The right to testify is also guaranteed through the compulsory process clause of section 14, which states in pertinent part that the accused shall have compulsory process for obtaining witnesses in the accused's favor . . . . Logically included in the accused's right to call witnesses . . . is a right to testify himself, should he decide it is in his favor to do so . . . since the most important witness for the defense in many criminal cases is the defendant himself. . . . The opportunity to testify is a necessary corollary to the guarantee, under section 10, against compelled testimony since every criminal defendant is privileged to testify in his or her defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Walsh*, supra, 125 Hawaii 285 n.22.

[7] In *State* v. *Papantoniou*, supra, 185 Conn. App. 100 n.14, this court did not address the defendant's claim that generic tailoring arguments violated the defendant's rights under the Connecticut constitution. Instead, we concluded that, even if we assumed that a constitutional violation had occurred, the defendant could not prevail on his unpreserved constitutional claim because the state had proved that the alleged constitutional violation was harmless beyond a reasonable doubt. Id., 103.

[8] The defendant does not brief separately a state constitutional due process claim or contend that the state constitution affords greater protections than its federal counterpart. Accordingly, we consider this claim only under the federal constitution. See, e.g., *State* v. *Scott*, 158 Conn. App. 809, 814 n.4, 121 A.3d 742 (when analysis of rights under Connecticut constitution is not briefed separately by appellant, we consider rights as coextensive with federal constitution), cert. denied, 319 Conn. 946, 125 A.3d 527 (2015).

[9] We note that the claims of error giving rise to these requests were not preserved and that our supervisory authority "is not intended to serve as a bypass to the bypass [doctrines], permitting the review of unpreserved claims of case specific error—constitutional or not—that are not otherwise amenable to relief under *Golding* or the plain error doctrine. . . . [A] defendant seeking review of an unpreserved claim under our supervisory authority must demonstrate that his claim is one that, as a matter of policy, is relevant to the perceived fairness of the judicial system as a whole, most typically in that it lends itself to the adoption of a procedural rule that will guide the lower courts in the administration of justice in all aspects of the criminal process." (Citation omitted; internal quotation marks omitted.) *State* v.

*Elson*, 311 Conn. 726, 768, 91 A.3d 862 (2014); see also *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 155–61, 84 A.3d 840 (2014) (noting that "a reviewing court has the authority to review [unpreserved] claims under its supervisory power" and setting forth "general principles" of such review). We conclude that the record in the present case is adequate for review of the defendant's claims, both parties have had the opportunity to be heard on these claims, neither party will suffer unfair prejudice by our review of the claims, and the state, which responded to these claims in its brief, does not object to review pursuant to our supervisory authority. See *In re Yasiel R.*, supra, 317 Conn. 790. Furthermore, for the reasons that follow, we conclude that the defendant's claims implicate the perceived fairness of the judicial system as a whole and merit review under our supervisory authority.

[10] Practice Book § 44-8 provides: "The defendant *must be present at the trial* and at the sentencing hearing, but, if the defendant will be represented by counsel at the trial or sentencing hearing, the judicial authority may: (1) Excuse the defendant from being present at the trial or a part thereof or the sentencing hearing if the defendant waives the right to be present; (2) Direct that the trial or a part thereof or the sentencing hearing be conducted in the defendant's absence if the judicial authority determines that the defendant waived the right to be present; or (3) Direct that the trial or a part thereof be conducted in the absence of the defendant if the judicial authority has justifiably excluded the defendant from the courtroom because of his or her disruptive conduct, pursuant to Section 42-46." (Emphasis added.)